Matter of the Judicial Settlement of the Accounts of AUGUSTUS H. VAN BUREN, as Administrator of NICHOLAS E. BRODHEAD, Deceased.*

(Surrogate's Court, Ulster County, January, 1896.)

1. Executors and administrators — Accounting — Allowance for attorney's fees.

The employment of attorneys to examine a large claim presented against the estate, and to properly defend the estate if they came to the conclusion that it was improper, is a just and necessary expenditure, and should be allowed to the administrator on his accounting.

2. Same.

So, also, as to reasonable expenditures for services of attorneys or counsel in defending the estate against a rejected claim or against foreclosure proceedings, to prevent a deficiency judgment against the estate.

3. Same — Increase of bills.

Administrators are not almoners of intestates' estates, and it is no part of their duty to suggest or advise an increase of bills presented, and where they do so, they will not be allowed the amount of such increase.

4. Same — Collecting testimony.

An expenditure for collecting testimony cannot be allowed an administrator.

5. Same — Payment of debts.

If an administrator pays to parties not entitled, he must reimburse the estate.

6. Same — Accounting — Absence of vouchers.

Claims against estates for moneys received, when unaccompanied by any voucher or evidence of indebtedness, should be scrutinized with care and have the clearest and most convincing evidence in their support.

* Received too late for insertion in proper place.— [Rep.

Surrogate's Court, Ulster County, January, 1896. [Vol. 19.

**7. Same — Claim of administrator against the estate.**

An administrator's claim against the estate, when unsupported by note or memorandum by deceased, must have additional evidence other than the administrator's own testimony to entitle it to an allowance.

JUDICIAL settlement of accounts.

John J. Linson, for the administrator.

Howard Chipp, Jr., special guardian of Harold Brodhead, an infant.

Virgil B. Van Wagonen, for the Kingston National Bank, a creditor.

William S. Kenyon, for Anna V. V. Kenyon and Cordelia E. Cockburn, creditors.

F. L. & F. A. Westbrook, for Catharine E. Deerman and James O. Merritt, creditors.

C. A. & E. Fowler, for Mary J. Mowell and Henry W. Palen Sons, creditors.

BETTS, S. Nicholas E. Brodhead died in this county, on July 25, 1892, intestate. On August 4, 1892, on the petition of his widow, and with no citation issued to, or appearance for, Harold Brodhead, an infant son, Augustus H. Van Buren, apparently a stranger to the estate, was appointed administrator of the estate of the deceased and entered upon the discharge of his duties. On July 12, 1895, a petition was filed in this court, by Mary J. Mowell, she claiming to be a judgment creditor of said administrator, praying that a decree be made requiring said administrator to render an account of his proceedings and pay her said judgment. A citation was accordingly issued, returnable July 22, 1895. The hearing was adjourned from time to time, until the administrator filed his account, vouchers and petition for judicial settlement of his accounts, when a citation was issued thereon, returnable September 9, 1895, and on the return of said citation the proceedings were consolidated, and a hearing was had. Objections to several matters in the account were filed on that day, and subsequently other objections were filed on behalf of this judgment creditor, Mrs.

Mowell, a very warm contest was had, much evidence was taken and the whole matter is now before me for decision.

The estate has been in almost constant litigation, and nearly the entire proceedings of the administrator were objected to and put at issue here.

The account as presented was certainly open to some criticism. The administrator charged himself in his original verified account with " $398.28 interest received " by him, though so warm was the contest that he filed a supplemental verified account, in which he charged himself with " $235.70 additional interest and dividends on stock." Interest and dividends received would seem to be a matter of computation only, but no explanation is given as to why this $235.70 was not included in the original verified account, which was filed subsequent to the July interest and dividends, on the only money and stock belonging to this estate. In the original account, also, certain bills of tradesmen for small amounts were included against the estate which had accrued nearly or quite three months after the death of Mr. Brodhead, and one of which was in the name of his wife. These accounts were corrected in the supplemental account, a note of $50 on which deceased was an indorser, and which had been paid by the maker, was stricken from the account, and a small balance to the credit of deceased was discovered in one of the city banks and credited to the estate.

, I shall briefly consider the items objected to, the evidence offered in relation thereto, and my reasons for the conclusions arrived at.

A great amount of litigation was had over a claim for $5,000, presented against this estate by the petitioning creditor, Mary J. Mowell. The administrator rejected the claim, a reference was had under the statute, the referee gave judgment for the full amount and costs, an appeal was taken by the administrator to the General Term, which reversed the decision of the lower court. Thereupon a new reference was had as to $2,000 of the claim, and eventually, judgment against the administrator was obtained for $2,821.10 thereon. A suit was also commenced by Mrs. Mowell, for the remaining $3,000, in the Supreme Court, which was discontinued by the plaintiff when the administrator filed his petition for a final accounting.

Many of the items objected to arose out of that litigation. Hon. John J. Linson, the partner of the administrator, was retained as his attorney, and owing to the absence of Mr. Linson, the Hon. Augustus Schoonmaker was employed to, and did, try the case the first time, for which he charged and was paid the sum of $185.

The remainder of this litigation was conducted by Mr. Linson, for which he charged, and received, the sum of $335. Three hundred and five dollars of this was objected to. Mr. Linson charged and received $200 more. Of this $150 was for litigation which arose out of two actions of the Kingston National Bank either against the estate, or in which the estate was interested, and $50 counsel fees. These charges were also objected to.

It is not the value of the attorney's services primarily that comes before this court for adjudication. The contract between an administrator and attorney is a personal one, and if a sufficient amount is not allowed here, it may be collected from the administrator. The question before me is, whether these were necessary expenses on the part of the administrator. § 2730, Code Civil Procedure. The amount of such fees is incidental to properly determining whether any expense was necessary or not; and if necessary, was the amount paid just and reasonable?

In the Mowell cases, a claim was presented of which the administrator claimed to know nothing, for a large amount, which, if established, would have amounted to nearly as much as the entire estate.

The employment of attorneys to examine this claim, and to properly defend the estate if they came to the conclusion that it was improper (which they did), would seem to be a just and necessary expenditure.

The two other items were, one on the rejected claim presented against the estate, which the administrator was apparently justified in rejecting, and the other a foreclosure case, in which a deficiency judgment would be a claim against this estate. The counsel fee of $50 objected to, as explained, seems not to have been used in the sense of a retainer, but to have been paid for services actually rendered the administrator.

I hold these to have been necessary expenses or disbursements within the meaning of the statute, and that the amounts thereof are not excessive, and they are allowed.

Among the list of creditors of the deceased in schedule "F" is an item of "Benjamin Day, services, $100," which was objected to "as excessive."

The only bill on file here, for this, is unverified, and reads as follows:

"The estate of N. E. Brodhead to Benj. Day, Dr.

To services and attendance in sickness of Brodhead, $100."

On the first hearing, there was a verified bill for $10, of Benjamin Day, apparently for the same services, which has disappeared, and which the administrator said he accidentally destroyed. It appeared that Day originally presented this verified bill for $10 for services. Some time afterwards, on consultation with the administrator and seemingly at his suggestion, it was decided to put in a bill for $100 instead, and the administrator drew up the bill for $100 above referred to, which Day never verified, and said that he was never requested to verify it. The administrator agreed to this bill, and put that amount in his account instead of this $10 bill. It was also agreed that the bill should be presented all for services, instead of for what it was actually for.

Mr. Day testified on his direct examination, that he had worked for Mr. Brodhead twenty-two days, at $3 per day, in the first of the year 1892, for which the deceased had paid him in part, and that the $100 was for the balance due him on that occasion, and for attending him in his last illness, which was of very short duration. Later on, among Mr. Brodhead's checks, Mr. Fowler found a check to Day for $66, and on subsequent examination Mr. Day acknowledged that he was paid in full for the January, 1892, services by that check, and that all his other regular assistance was for a short time before Brodhead died, and laying him out, for which he charged $10, and that was what the verified bill of $10 was for. Then he testified that he had attended the deceased at other times and places, not at his residence, and had bought and secreted liquor for him, for which he charged the additional $90. He had no record nor account of the amount of such services and attendance, nor the amount of liquors bought.

I have no time nor disposition to quote extensively from the evidence in regard to this claim. After a long series of leading questions by the administrator, Mr. Day finally swore plumply to this bill, but said on the cross-examination that he did not intend to charge for the liquor when he bought it, and that he gave it to Mr. Brodhead out of friendship; and if Mr. Brodhead had lived, he, probably, would not have charged for it.

It was held in Devin v. Patchin, 26 N. Y. 441, that surrogates cannot lawfully act as almoners of the estates of deceased persons. To this I may add, that administrators are not almoners of dead men's estates. It is no part of their duty to suggest or advise an increase of bills presented against their intestates. There is not one rule of common honesty between living men, and another between

Surrogate's Court, Ulster County, January, 1896.      [Vol. 19.

a living man and the estate of a deceased person. Bills for alleged debts that would not be presented against a living man should not be presented against his estate. If presented they should not be allowed. The various creditors of Mr. Brodhead for food and clothing furnished, and money loaned, are entitled to their *pro rata* share of his estate undiminished by bills that would not have been presented to him if he had lived.

The bill for $100 is disallowed, and the original bill for $10 is allowed.

Schedule " D " of the original account filed contains items aggregating $240.38, for amounts paid to various parties, attorneys and others, for " collecting testimony " in the Mowell case, and for the expenses of the administrator for the same purpose, all of which were objected to.

The expenses of the administrator, $43.38, are allowed, as is also $32 to Thomas B. Johnston, for subpoena fees paid witnesses and for subpoenaing them, leaving a balance of $165, remaining for amount expended for collecting testimony. Fifty dollars of this was paid to a Mr. Golden, an alleged detective in New York city, recommended by Superintendent Byrnes for investigating the relations between Mrs. Mowell and a gentleman in New York city. This might be of interest as a matter of contemporaneous history, but what possible relation there was between that fact and the claim of Mrs. Mowell the evidence does not disclose, and I am at a loss to conjecture. Its necessity was not shown. There is no voucher for its payment, and it is disallowed.

The remaining $115, expended for collecting testimony, seems to have been expended for the purpose, as testified to by the administrator, of showing the relations between Mrs. Mowell and a witness in the Mowell case, a Mr. Prime, and also between Mrs. Mowell and Mr. Brodhead, the deceased. The evidence obtained, as testified to, was copies of telegrams from or to Mrs. Mowell from parties in New York city, peering over a transom into Mrs. Mowell's room, in a New York hotel, at 11 or 12 o'clock at night, and generally shadowing her, and which were rendered by two lawyers and two constables. Eighty dollars were charged by the lawyers and $35 by the constables. Judge Schoonmaker is said to have advised the obtaining of this testimony. Judge Schoonmaker is dead.

It is difficult to see on what legal principle this expense can be allowed, or how it can be construed as necessary. The de-

cisions are directly against it. Matter of Collyer, 1 Connoly, 546, 557, 559; Matter of Van Nostrand, 3 Misc. Rep. 396-398; Matter of Harbeck, 62 N. Y. St. Repr. 373.

In the latter case the general rule is laid down, " that administrators, executors and trustees are not only bound to assume the responsibilities and exercise the discretion of their office, but must also perform, within reasonable limits, the actual manual labor required to the due execution of the trust.". Matter of Duell, 69 N. Y. St. Repr. 487; Matter of Bender, 67 id. 682, which is a decision of the General Term in this Department, in which it is held that a surrogate cannot tax for the attendance of an expert witness a greater sum than that prescribed as legal fees for witnesses by section 3318, Code of Civil Procedure; and that such compensation is not one of the reasonable and necessary expenses which the surrogate may include in the taxation of the executor's costs.

The case in 1 Connoly, *supra*, is a case precisely in point, and holds that an expenditure for collecting testimony cannot be allowed an administrator.

The expense of the net was entirely disproportionate to the value of the resultant fish, for, notwithstanding this elaborate scheme of espionage, and this expense of $215, not one word of this testimony sought for was ever introduced before the two learned referees who at different times have passed upon the Mowell claims.

The administrator states that four citizens of this city told him alleged facts that led to this expense, one of whom undertook to make his word good at an expense to the estate of $50. The natural and reasonable way would seem to have been to have subpoenaed these citizens, and examined them as to their knowledge in the matter, and from the result of this evidence have issued other subpoenas. But this was not done.

This administrator is a lawyer, and accustomed to collecting and weighing testimony himself. He has already been allowed $185 for one attorney, $565 for another, and in the Lovel-Quitman case his attorney was allowed $93 more, which would seem to be a sufficient allowance for attorneys, even in this estate, for litigations prior to the final accounting, without $80 additional for legal services of the kind herein disclosed. This is not the case of an executor brought into the care of an estate without his knowledge or consent, nor of an administrator endeavoring

Surrogate's Court, Ulster County, January, 1896.     [Vol. 19.

to make as good settlement as possible for a near relative, but a lawyer not of any kin to deceased, appointed apparently of his own volition, and necessarily bound to use his best ability and legal training to properly discharge the duties of the trust he had voluntarily assumed.

The necessity for the expenses has not been shown, and they are disallowed.

Schedule " F," containing a list of creditors of the deceased, contains this item:    " Julia C. Brodhead, money received, $300." And this item is objected to.

No verified claim has been filed here, and, so far as appears, none was filed with the administrator.   The administrator testified that deceased told him that he had had $300 of his wife, Julia C. Brodhead, of her moneys.   No proof has been given or offered in support of this claim, nor does there even appear to be a claim, and it is disallowed.

Objection was also made to the bill of M. A. Keefe, which was corrected, I understand, in the supplemental account.

Objection was also made to an item in schedule " C " of said account as follows:

" Recovered from A. L. F. Deyo, county treasurer, being due from him to the estate, $438.92," as insufficient.

The facts in this case seem to be briefly these:   Mr. Brodhead had assigned to Reuben Bernard, as trustee for the sureties upon his official bond as county treasurer, certain life insurance policies. Upon the death of Mr. Brodhead these policies were turned over by Mr. Bernard to Mr. Van Buren, the administrator, and he collected the amount due upon them.   Substantially, the only claim that was made against the proceeds of these policies was made by Andrew L. F. Deyo, county treasurer, for the 15 per cent. reduction, made by the Ulster County Savings Institution in certain trust funds of the county treasurer on deposit in that bank.   This bill was for $1,314.07, and included two claims arising out of the estate of the late Caleb Leverich, one of $200.12, and the other of $410.51, amounting to $610.63.   The bill of the county treasurer was paid by the administrator through Mr. Bernard, the trustee, to the county treasurer.   Later it was discovered that the county treasurer was not responsible for this sum of $610.63, and the administrator after demanding its return brought suit therefor.

It is thus seen that the administrator had in his possession the sum of $610.63, which rightfully belonged to this estate.   The

county treasurer presented a bill for this identical $610.63, and the administrator paid it to him by way of Mr. Bernard, in satisfaction of that bill, supposing at the time, it would seem, that it rightfully belonged, either to Mr. Bernard as trustee, or to the county treasurer. That it was afterwards learned by the administrator that this estate was not liable for that amount. Repayment was requested by the administrator, refused by the county treasurer, suit was brought, and the administrator was successful; but of the original sum of $610.63, and some accrued interest, $6.59 — $178.30 were lost to the estate in transit, the administrator receiving only $438.92; the difference, $178.30, being received by the attorneys as follows: The administrator's attorney, $118.30; county treasurer's attorney, $30, and attorney for Leverich estate, $30. It was claimed by the contestant that an administrator could not thus pay out the moneys of the estate, sue for their recovery and put the estate to the costs thus incurred; while the administrator claimed that these costs having been allowed by the Supreme Court as proper in that action that this court could not interfere.

The question is novel, and deservedly so. But as I construe it, it is before me only as to the propriety of the administrator's payment of this sum of $610.63 to the county treasurer or to Mr. Bernard.

An administrator is to marshal the assets of the estate, convert them into money, and distribute it to those entitled. If he pays to parties not entitled, he must reimburse the estate. There is no different rule here from what there would be between individuals.

It is strenuously claimed by the administrator that as he gave these moneys to Mr. Bernard instead of to the county treasurer, that he should not be charged with their loss, as Mr. Bernard had an assignment of the insurance policies. I do not think this changes the rule at all. The route may have been circuitous, but the destination was the same; and when the administrator went to look for his money, he went to the county treasurer instead of to Mr. Bernard.

Mr. Bernard testified, in substance, that he had allowed the administrator to collect the money for these insurance policies, and that he had made no claim, as trustee or otherwise, to any portion of the proceeds, except to sufficient thereof to protect the sureties of Mr. Brodhead as county treasurer. See Matter of Peyser, 5 Dem. 244, which holds that where an executor in good faith paid an invalid legacy tax to the United States government, he would be

personally charged with the amount so paid. If an administrator assumed to pay a demand which had no legal foundation, and which could not have been recovered, the claim might be properly disallowed on his accounting. Redfield's Surrogate's Prac. (5th ed.) 512.

Under the objection made, and proof given, I am constrained to charge the administrator with the sum of $171.71; being the sum of $610.63 improperly paid out to individuals shown not to have been entitled thereto, less the sum of $438.92, recovered.

A somewhat similar objection was made to the amount realized by the administrator upon the Lovell-Quitman claim. In this case the facts and the evidence are different. The fund never was in the administrator's possession. The administrator or his attorney attempted to collect the amount due the estate without suit, but was unable to do so. A suit was necessarily brought, and the sum obtained by the administrator was seemingly all that could be realized from that source.

The account of the administrator is passed and allowed, so far as the objection of the contestants to that claim is concerned, and he may charge the estate with the amount of costs received by his attorney in this case, and credit himself with the same amount. Estate of Bradley, 17 N. Y. St. Repr. 836.

Schedule " E " of the list of creditors contained the following item: " Catharine E. Deerman, money received, $400," and this item was objected to.

Although there was much confusion in the evidence offered, the facts appeared to be, that one Catharine E. Eldred, subsequently Catharine E. Deerman, and now Catharine E. Branthover, in or prior to 1890, acquired by contract of sale, or otherwise, from the state, certain real estate in the town of Hurley in this county, in part payment for which she had given the state a bond for $2,000. This real estate, it seems, had been acquired by the state by the foreclosure of a loan commissioner's mortgage. A barn upon the premises was insured by two separate policies, one for $200, made payable to the United States loan commissioners, and the other for the same amount to the then Catharine Eldred. This latter policy was in the custody of Mr. Van Buren. This barn burned November, 1890, and the proceeds of the first policy, it is conceded, were paid to the loan commissioners, of which N. E. Brodhead was one, and by them transmitted to the comptroller, and credited on the bond. It was claimed by Mrs.

Branthover that the proceeds of the other policy, with about $200 in cash, making the $400 in question, were paid to Mr. Brodhead either as loan commissioner or as a banker, to transmit it in some way to the comptroller for payment on this bond; and that he did not do so nor did he repay it to her. The evidence which was given in support of the claim was very unsatisfactory. Mrs. Branthover said that she filed a verified claim for this amount with the administrator, and the administrator said that she did not do so, and none was produced. The testimony that was given in support of the claim was by the administrator and Mrs. Branthover. She had been the client of Mr. Van Buren for some years and is yet. The proceeds of this particular policy were paid at the insurance office of C. A. Murray, in Rondout, in February or March, 1891, by check to Mrs. Deerman's order, in the presence of Mr. Van Buren, and they came uptown together at once. She testified that the check was brought up to the Kingston National Bank. The administrator thought he might have got it cashed and taken the proceeds there, although it was not shown that he went anywhere to get it cashed. It was claimed that this $198, proceeds of the policy, and $202 taken from the pocket-book of Mrs. Deerman, were given to Mr. Brodhead in the bank by Mrs. Deerman and the administrator, and that all the bank clerks, and Mr. Bernard, were there at the time, and saw the transaction. Neither the clerks nor Mr. Bernard were examined in regard to this matter, although Mr. Bernard was on the witness-stand, and was examined by the administrator in regard to another matter at considerable length. The answers of Mrs. Branthover, as to how she came by the other $200 taken from her pocket-book, were entirely unsatisfactory. Only $170 were shown to have been credited upon the bond, which was some part of the first $200. No other payments were shown to have been made on this bond since it was given. Mrs. Branthover and her attorney apparently endeavored to get the first $200 from the loan commissioners without success, as Commissioner Brodhead insisted on its being applied on the bond. If the loan commissioners were authorized by law to receive this money, then its payment would be a good payment, and Mr. Brodhead's estate would not be liable to repay it to Mrs. Branthover. If they were not authorized to so receive it, then it should have been clearly shown that it was paid to Mr. Brodhead, and that it never reached the comptroller. This was not done. Whatever doubt

Mrs. Branthover may have had as to where the principal of this bond was to be paid, she seemed to have none as to where she should pay the interest thereon, as in November, 1891, as she testified, she went to Albany to the comptroller's office, to pay the interest, unattended by Mr. Van Buren. She testified that she then learned for the first time that this $400 had not been paid. She further testified: " I found out he had not paid it, and of course I had paid the money to Mr. Van Buren and flew on him for it." Why her pinions were not plumed, or her flight directed, towards Mr. Brodhead instead of Mr. Van Buren, did not appear. This was the last report from the comptroller's office and it was four years ago, and about eight months before Mr. Brodhead died! It was not shown that Mrs. Branthover ever applied to Mr. Brodhead for this money, or inquired why he had not forwarded it. This money was claimed to have been paid to a busy bank man, during banking hours, and yet no memorandum or receipt or anything was produced to show that he ever received it. The custom of banking men and loan commissioners giving, and people dealing with them requiring, some receipt or memorandum of payment is almost universal enough for the court to take judicial notice of it.

This payment, it was claimed, was made in February or March of 1891, about sixteen months prior to Mr. Brodhead's death, and was made to him in trust. The reputation of Nicholas E. Brodhead, the banker, for uprightness and honesty is part of the rich heritage of Ulster county, and is not disturbed by a few erratic movements in the last few weeks of his life, when broken by nervous strain, disease and overwork. He gave convincing proof of the kind of rugged honesty that flowed in his veins, when on October 3, 1891, the very day the Ulster County Savings Institution closed its doors, he executed to the sureties upon his official bond as county treasurer an assignment of his life insurance policies, his quickest and about his only available assets, to protect them from possible damage by reason of loss upon trust funds deposited in that institution by his predecessors in office, and not withdrawn by him. His action then did not correspond with this alleged delay of sixteen months in transmitting to the comptroller $400 received for that purpose. This action of Mr. Brodhead speaks louder and plainer than the contradictory evidence which was produced on this trial.

Claims against the estate of dead men for moneys received, when unaccompanied by any voucher or evidence of indebtedness, should be scrutinized with care and have the clearest and most convincing

evidence in their support. Wheeler v. Eastwood, 68 N. Y. St. Repr. 297.

The testimony of this woman on the witness-stand, and her manner of giving it, distinctively negatives the idea that she would either wait until November to find out whether it had been paid or not, or that she would rest quietly for sixteen months with some one else having $400 of her money without making a very pronounced effort to get it back.

By the evidence offered, I am not convinced that Nicholas E. Brodhead ever received any part of this $400 to his own use, and the claim is not allowed.

The administrator has put in schedule "F" of his account these items: "A. H. Van Buren, money paid, $136," and "A. H. Van Buren, loaned, $400," and these items are objected to.

The $136, the administrator testified, was to pay a bill of deceased to Hamilton & Smith, physicians, in New York city, for that amount. In support of this he produced a check given by him to Hamilton & Smith, dated November 23, 1891, for $136, on the face of which was written ("Bill, N. E. Brodhead"). It also bore the stamp of the bank showing that it was paid December 4, 1891, eleven days thereafter.

Ordinarily, the payment by one man of another's debt would create no claim against the person whose debt was paid. The administrator testified that Mr. Brodhead told Dr. Hamilton to send the bill to him (Van Buren), and Van Buren would pay him for it. There was no evidence whatever in support of this claim except the testimony of the administrator. The contestant objected to this evidence under section 829 of the Code, but the creditors cannot take that objection. Matter of Le Baron, 67 How. Pr. 346; Gillies v. Kreuder, 33 Hun, 314; affirmed, 102 N. Y. 666.

The special guardian conceiving that as there was no surplus to come to the infant in any event, his duty did not require him to make the objection, made none.

On a subsequent hearing, the attorney for the contestant, having secured from the Kingston National Bank a statement of Brodhead's bank account, found a statement of a check of the same amount on the same date, paid on that day, and the administrator admitted that a check for this amount, i..e., $136 was given to him by the deceased, and that it was originally given to him to pay this $136. This would have put the $136 in his hands from Brodhead eleven days before his check for Brodhead's bill to Hamilton &

Smith was paid. The administrator said that afterwards Brodhead changed his mind as to the application of this particular check, and he gave a confusing list of checks of which this $136 check formed a part, none of which except a $50 check could be found, and one of which, an $80 check, was not on the list of the bank checks. Indeed, it adds to the trouble in settling the disputed questions here that this administrator could produce only one or two of Brodhead's checks to himself, and could not find Brodhead's check stubs, while other checks were produced in profusion. But Brodhead had already, on the same day that Van Buren dated this $136 check to Hamilton & Smith, given him a check for this $136, and he had procured the money on it eleven days before Van Buren's check was paid at the bank. Whatever afterthoughts Mr. Brodhead may have had, the conclusion is irresistible that one $136 check, originally intended to pay for the other, did in fact pay for it.

The claim for the $136 presented here is not in such shape that it can be allowed, with check stub, other checks, and vouchers all missing. The claim is held not to be proven against the estate.

The personal claim of the administrator for $400 against the estate is for money alleged to have been loaned to deceased by him in or about November, 1891.

The administrator testified that Mr. Brodhead at that time, for some purpose unknown to him, desired to borrow $400, and requested the loan of that amount of him. That he did not have that amount of cash, and that he knew at that time that the First National Bank of Rondout would discount Brodhead's note for almost any amount, and he so suggested to Brodhead. That Mr. Brodhead said he could not do that, because the gentlemen with whom he was directly connected in business would be very mad at him; that he (Van Buren) said that he would make the note himself, which he did, and went to Rondout with his own note for $325, or $350 indorsed by his aunt, and the First National Bank officers, after listening to this tale, discounted for the benefit, and on the credit of the county treasurer of Ulster county, and the receiver of the Ulster County Savings Institution, reinforced by the credit of Mr. Van Buren and Mr. Van Buren's aunt, a note of $325 or $350. The cash therefor, together with sufficient cash to make the amount $400, was carried by Mr. Van Buren and given to Mr. Brodhead as a loan, and it had never been repaid. Mr. Brodhead was seriously sick in bed at the time, and when Mr. Van Buren returned, Mr. Benjamin Day (whose bill has been disposed

of), was present and saw Mr. Van Buren bring in a roll of bills, and tell Mr. Brodhead that there was the money he wanted to borrow. The deceased directed Mr. Van Buren to put it in the bureau drawer, which he did, and shortly after left the room. Mr. Day knew nothing of the amount and Mr. Brodhead did not tell him; but subsequent to Mr. Van Buren's leaving the room he extolled the value of his friendship to Day. He had suggested the propriety of taking a drink when Mr. Van Buren appeared with the money, but Mr. Day had discouraged this, as liquor, which was then given freely to Mr. Brodhead by order of his physician, had been just given to him. Mr. Van Buren testified that no note or memorandum of this claim was taken because he had been very intimate with Mr. Brodhead all his life, and had frequently borrowed money of him, and loaned money to him, and their relations were very close. It is to be regretted that these relations were not sufficiently intimate for the administrator to know where Mr. Brodhead kept his check stubs, and where he kept his returned checks, that were drawn to Mr. Van Buren's order. It was shown by the contestant that Mr. Day was in attendance professionally in January, 1892, for the first, and as the administrator insisted that it was in or about November, 1891, that the loan was made, and because of the arrangement between Day and the administrator as to the amount of Day's bill; that Day's corroboration might be prompted by self interest, and that this bill for $400, should be disallowed. The administrator insisted that Mr. Day was mistaken as to the precise date, and that the corroboration as to the main fact was sufficient.

There are decisions that hold that an administrator's claim against his estate, when unsupported by note or memorandum by deceased, must have additional evidence other than the administrator's own testimony, to entitle it to an allowance. Wood v. Rusco, 4 Redf. 380; Clark v. Clark, 8 Paige, 157; Williams v. Purdy, 6 id. 166; Kyle v. Kyle, 67 N. Y. 408.

The administrator seemed to have brought all the evidence he could, and he swore positively to the loan, and to the fact that it had never been repaid him, and Mr. Day corroborated the fact of a loan. There was no evidence whatever against it, nothing tangible on which to predicate an adverse decision, except to hold the claim not proven.

I am disposed to, and do (with some misgivings as to the sufficiency of the proof), allow his claim.

Surrogate's Court, Ulster County, February, 1896.    [Vol. 19.

There is no charge for a headstone or monument to deceased in the account filed. It would seem that none had been provided. If so, it is a shame that one so charitable, so well known, and so deserving in life, should not have care enough taken of his memory to have some stone to mark his last resting place. Notwithstanding the estate is insolvent, the creditors, I am sure (most of whom were his warm friends), would not object to a reasonable expense to mark his grave, and unless some objection is made by the creditors appearing, the administrator can contract at once for a headstone suitable to the standing of deceased, file a further supplemental account with that included, and his account for the same will be passed. Thus may be spared this last reproach on the memory of deceased, that he whose hands were always open to assist in relieving the wants of any deserving one, had neither friends nor property sufficient to properly mark his last resting place, and that the contentions over the small property he left were so numerous and so bitter that the man and his unmarked grave were forgotten.

Decreed accordingly.